FILED & ENTERED

MAR 29 2016

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Pgarcia     DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>TAG ENTERTAINMENT CORP.,<br><br><div align="center">Debtor.</div><br>_____<br>DIANE C. WEIL, Chapter 7 Trustee,<br><br><div align="center">Plaintiff,</div><br>v.<br><br><br>THE UNITED STATES OF AMERICA,<br><br><div align="center">Defendant.</div> | Case No.: 1:09-bk-26982-VK<br><br>Adv. No.: 1:10-ap-01342-VK<br><br>Chapter: 7<br><br><br>**REPORT AND RECOMMENDATION TO DISTRICT COURT FOR WITHDRAWAL OF REFERENCE** |

After the Supreme Court's decisions in *Stern v. Marshall*, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), and *Executive Benefits Insurance Agency v. Arkison*, 134 S.Ct. 2165, 189 L.Ed.2d 83 (2014), this Court does not have constitutional authority to enter judgment on the chapter 7 trustee's fraudulent transfer claims. Both parties did not consent to final adjudication of this matter by this Court. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015).

Attached please find the Court's report and recommendation to the District Court for withdrawal of reference and the determination of the chapter 7 trustee's fraudulent transfer claims.

# **INDEX**

I. INTRODUCTION………………………………………………………………….. 6

II. STATEMENT OF FACTS……………………………………………………… 7

   *A. Debtor's Origin and Operations*…………………………………………….... 7

   *B. The Pre-Merger Audit and the Withdrawals by Officers Account*……………………….. 8

   *C. Secured Collateral Note*………………………………………………… 10

   *D. The Satellite Strategic Partners Financing*………………………………… 11

   *E. Background of Mr. Austin*………………………………………………… 13

      *1. Mr. Austin's Resignation and Subsequent Reinstatement*……………………… 13

      *2. Mr. Austin's Compensation From Debtor*………………………………… 14

      *3. Mr. Austin's Criminal Case*………………………………………… 14

      *4. Mr. Austin's Restitution Payment*………………………………… 16

   *F. The Austins' Real Estate Transactions*…………………………………… 17

      *1. Purchase of the Valleyheart Property*…………………………………… 17

      *2. Purchase of the Malibu Road Property*………………………………… 18

      *3. Sale of the Valleyheart Property*……………………………………… 18

      *4. Purchase of the PCH Property*………………………………………… 18

      *5. Sale of the Malibu Road Property*……………………………………… 19

      *6. Purchase of the Colony Property*……………………………………… 19

      *7. Sale of the PCH Property*…………………………………………… 20

      *8. Sale of the Colony Property*………………………………………… 20

   *G. Other Relevant Transfers*…………………………………………… 21

      *1. The Vechery Trust Loans to Limited Partnerships*…………………………… 21

      *2. Debtor's Transfers to SAP*………………………………………… 22

   *H. Debtor's Bankruptcy Case and the Adversary Proceeding*………………………… 23

III. LEGAL STANDARDS……………………………………………………… 24

   *A. Avoiding a Transfer Under 11 U.S.C. § 544(b)*……………………………… 24

      *1. Interest of the Debtor in Property*…………………………………… 25

      *2. Transfers Voidable Under Applicable State Law*………………………… 25

      *3. Timing Limitations Under 11 U.S.C. § 546(a) and CUFTA*……………………… 27

      *4. Establishing Intent to Defraud Through a Ponzi Scheme*……………………… 28

      *5. Tracing Transfers*………………………………………………… 29

   *B. What Constitutes a Transferee*……………………………………… 31

   *C. Cal. Civ. Code § 3439.08 as a Defense to Avoidance of a Fraudulent Transfer*………… 33

   *D. Recovery of Restitution Payments*…………………………………… 33

   *E. Sovereign Immunity*………………………………………………… 34

   *F. Controlling Effect of Pretrial Orders*………………………………… 34

IV. ANALYSIS………………………………………………………………… 35

   *A. The Trustee Has Standing*…………………………………………… 35

   *B. Defendant Waived the Statute of Limitations*………………………………… 35

   *C. The Amended Complaint Relates Back to the Petition Date*……………………… 35

   *D. The United States May Not Assert Sovereign Immunity*…………………………… 35

   *E. Restitution Payments Are Subject to Avoidance*………………………………… 36

   *F. Defendant Is Not a Good Faith Transferee*……………………………… 36

   *G. Debtor Was Not Involved in a Ponzi Scheme*………………………………… 37

*H. The Trustee Has Not Shown the United States' Receipt of Any Transfers from Debtor*.... 38

   *1. Funding for the Purchase of the Colony Property*……………….....…….………..   38

    *a. The $250,000 Cash Deposit by Mrs. Austin*…………………………………….   38

    *b. The $2.5 Million Deposit by Charles E. Ruben and Associates*……………….....…   39

    *c. The $2,418,530.98 Deposit by Malibu Corp.*…………………………………….   41

     **i. The $20,000 and $100,000 January Deposits from the Austins**……………………   42

     **ii. The $475,000 Deposit from Mrs. Austin**…………………………………….   42

     **iii. Debt Encumbering the Malibu Road Property**…………………………….   42

   *2. Other Miscellaneous Transfers*……………………………………………   42

    *a. The Officer Account Loans*……………………………………………….....   43

    *b. The PCH Property Deposit*…………………………………………………   44

    *c. The Satellite Financing Proceeds*…………………………………………….   44

    *d. The Transfers from Debtor to SAP*…………………………………………….   45

   *3. The Trustee Did Not Meet Her Burden of Proof*…………………………………….   45

**V. RECOMMENDATION**………………………………………………………………………46

**APPENDIX A – REAL ESTATE TRANSACTIONS INVOLVING THE AUSTINS**………..  47

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>TAG ENTERTAINMENT CORP.,<br><br><br>Debtor.<br>_____<br>DIANE C. WEIL, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No.: 1:09-bk-26982-VK<br><br>Adv. No.: 1:10-ap-01342-VK<br><br>Chapter: 7<br><br>**REPORT AND RECOMMENDATION**<br><br>Date:      July 28-August 4, 2014<br>Time:      9:30 a.m.<br>Place:      Courtroom 301<br>             21041 Burbank Blvd.<br>             Woodland Hills, CA 91367 |

Diane C. Weil, chapter 7 trustee (the "Trustee"), is requesting avoidance of allegedly fraudulent transfers to defendant United States of America (the "United States") pursuant to 11 U.S.C. §§ 544 and 550.  For several days between July 28, 2014 and August 4, 2014, the Court conducted the trial.

Having considered the parties' trial stipulation, the witnesses' testimony at trial, the remainder of the evidentiary record, the parties' legal memoranda and the arguments of counsel for the Trustee and the United States, the Court will recommend that judgment be entered in favor of the United States based upon the following findings of fact and conclusions of law.

## I.    INTRODUCTION

On December 16, 2009, TAG Entertainment Corp. ("Debtor") filed a chapter 7 petition. On August 11, 2010, the Trustee initiated this adversary proceeding, alleging that a $5,989,999 restitution payment received by the United States from Debtor's founder, Steven Kent Austin, constitutes a fraudulent transfer under 11 U.S.C. §§ 544 and 550 and Cal. Civ. Code § 3439.04(a)(1).

Following the incorporation in 1999 of Debtor's predecessor in interest, Debtor became an entertainment company which acquired and licensed motion pictures and assisted with the production and distribution of films.  As part of this operation, Debtor entered into agreements with several limited partnerships.  The limited partnerships would, in turn, fund production of the films by "cold-calling" investors.

Through his involvement with these limited partnerships, Mr. Austin devised and participated in a scheme to defraud investors.  Specifically, Mr. Austin informed potential investors that their money would be used to finance the development, production, marketing and distribution of motion pictures.  However, upon receiving the money sent by investors, a large portion of the funds were taken by Mr. Austin and other "telemarketers" for personal use.

Consequently, in 2007, the United States charged Mr. Austin with mail fraud and subscribing to a false tax return.  Mr. Austin pleaded guilty to both the charges.  As a result of the plea agreement, Mr. Austin agreed to pay restitution to his victims.  On May 31, 2007, Mr. Austin made a restitution payment in the amount of $5,989,999.  It is undisputed that this restitution payment derived from the sale of Mr. and Mrs. Austin's residence located at 78 Malibu Colony Road, Malibu, California 90265 (the "Colony Property").

The Trustee argues that the restitution payment originated from Debtor.  At trial, the Trustee pointed to several real estate transactions, the last of which was the sale of the Colony

Property for the purpose of meeting Mr. Austin's restitution obligation.  The Trustee argued that Debtor was the originating source of funding for these real estate transactions.[1]  In addition to the real estate transactions, the Trustee referenced certain additional transfers which, she argued, also were sourced from Debtor.

## II.       STATEMENT OF FACTS

### A.       *Debtor's Origin and Operations*

On August 1, 1995, Power Marketing, Inc. ("Power") incorporated in Delaware. Joint Pretrial Order ("JPO"), ¶ 5.[2]  On September 29, 1999, Mr. Austin incorporated TAG, Inc. in California. *Id*., ¶ 4.  According to his testimony, Mr. Austin incorporated TAG, Inc. as a film production company.[3]

On November 23, 2004, Power executed a reverse merger with TAG, Inc., and TAG, Inc. became a wholly owned subsidiary of Power. *Id*., ¶ 7.  Power then changed its name to TAG Entertainment Corp., which was the Debtor's name when Debtor filed its bankruptcy petition. *Id.*

Throughout its years of operation, Debtor acquired and licensed motion pictures and facilitated the production and distribution of films. *Id*., ¶¶ 8-9.  From the date of incorporation until Debtor filed for bankruptcy, Debtor was involved in the production or distribution of the following movies: (1) *Castle Rock*; (2) *The Retrievers*; (3) *Hansel & Gretel*; (4) *The Santa Trap*; (5) *No Place Like Home*; (6) *Dumb Luck*; (7) *Miracle Dogs*; (8) *Funny Money*; (9) *Moto Cross Kids*; (10) *American Black Beauty*; (11) *Popstar a.k.a Downtown*; (12) *Supercross the Movie*; (13) *Red Riding Hood*; (14) *Miracle Dogs Too*; (15) *Wild Stallion*; (16) *Crankshaft*; and (17) *Ghost Town*. *Id*., ¶ 10.

In order to produce these movies, Mr. Austin created several limited partnerships, allegedly to obtain money from investors to cover production costs.  According to Mr. Austin, Debtor initially was the general partner to these limited partnerships.  Mr. Austin further testified that Steve Austin Productions ("SAP"), his "loan-out company," later stepped in as the general

---

[1] The real estate transactions are illustrated in the chart attached as "Appendix A."
[2] All references to the Joint Pretrial Order are to the parties' stipulated facts.
[3] If no other citation is given, the facts set forth are from the trial testimony.  All cited exhibits and other evidentiary references were admitted at trial.

partner.[4]  Mr. Austin testified that before Debtor's reverse merger with Power, after funding

production advances to make the movies, Debtor would bill partnerships.

On November 23, 2004, as a result of Debtor's reverse merger with Power, Debtor

became a publicly traded company with the trading symbol TAGE.OB. *Id.*, ¶ 7; Deposition of

Victor DiGioia, 15:13-20.  According to Mr. Austin, after the merger, Debtor became a

distribution and licensing entity that would charge a percentage fee to the partnerships.

**B.**     ***The Pre-Merger Audit and the Withdrawals by Officers Account***

In preparation of the reverse merger, Debtor hired Grobstein, Horwath & Company LLP

("Grobstein") as certified public accountants for the purpose of preparing an audit.  Jerry Levine,

a partner at Grobstein at the time, testified that Grobstein had previously prepared tax returns for

Debtor and certain related partnerships.  Mr. Levine testified that during Grobstein's audit of

Debtor, Grobstein highlighted several concerns regarding Debtor's lack of documentary support

for the numbers in the corporate books and records.  On February 9, 2005, Grobstein resigned as

Debtor's auditors.  Mr. Levine testified that Grobstein had serious concerns about Mr. Austin

withholding information from the auditors.

Upon Grobstein's resignation, Debtor hired A.J. Robbins P.C. to complete the audit.  A.J.

Robbins, a certified public accountant, testified that his firm reviewed Grobstein's work papers

during the audit.  Deposition of A.J. Robbins, 28:3-29:22.  The financial report generated by

Grobstein and used by Mr. Robbins reflected, as of December 31, 2003, a balance of $1,542,294

for an account characterized as "withdrawals by officers."  *Id.*  The same report listed the

following prior balances for the "withdrawals by officers" account: (1) as of December 31, 2001,

a negative balance of $1,060,216; and (2) as of December 31, 2002, a negative balance of

$1,424,228. *Id.*  Based on this account, as of December 31, 2001, Mr. Austin owed Debtor

$1,060,216. *Id.*  The report indicates that Mr. Austin withdrew $364,012 in 2002 and $118,066 in

2003, resulting in an aggregate balance of $1,542,294 as of December 31, 2003. *Id.*[5]

---

[4] As Mr. Austin testified is common in the entertainment industry, Mr. Austin would be paid for his services and production expenses through SAP.
[5] The relevant transfers in this case are from December 16, 2002 onward, *i.e.*, within seven years of the petition date. Pursuant to Cal. Civ. Code § 3439.09, a cause of action with respect to a fraudulent transfer must be brought within

Attached to Debtor's Form 8-K is an unaudited report which was filed with the Securities and Exchange Commission ("SEC"). *Plaintiff's Exhibit 86.* The Form 8-K states a return of capital amount of $364,012 for the year 2002 and $168,066 for the year 2003. *Id.* Thus, as concerns the amount withdrawn in 2003, there is a discrepancy of $50,000 between these reports. *Compare Plaintiff's Exhibit 1951760392 with Plaintiff's Exhibit 86.*

According to Jeff Gonzalez, a consultant and interim chief financial officer of Debtor between 2003 and 2006, Mr. Austin incurred the $1,542,294 debt as a result of multiple transactions that could not be supported. Deposition of Jeff Gonzalez, 16:21-18:8. Mr. Gonzalez explained that, after working with auditors to prepare documents for filing with the SEC, Mr. Austin agreed to treat the unsupported withdrawals as loans by Debtor to Mr. Austin (the "Officer Account Loans"). *Id.* Mr. Gonzalez also testified that many of these transfers were used to operate Debtor; however, because Debtor's management and the auditors could not specifically match each transfer to a production expense or other operating cost, they decided to treat the transfers as loans to Mr. Austin. *Id.* Mr. Gonzalez noted that he did not know whether Mr. Austin actually received $1,542,294 from Debtor. *Id.*, 18:9-16.

Mr. Austin testified similarly. According to Mr. Austin, Debtor would advance production costs to Mr. Austin, who would then use the funds to cover production of a film. Mr. Austin recorded many of these transactions in "petty cash envelopes" that would list each expense. *Defendant's Exhibits CC-SS.* After the audits were completed, Mr. Austin agreed to be financially responsible in the amount of $3.1 million. *Plaintiff's Exhibit 86.* This amount included the principal amount owed to Debtor, interest incurred on the principal amount and the principal and interest owed to Majestic Film Partners I, LP. *Id.*

To satisfy this $3.1 million debt, Mr. Austin surrendered 777,504 shares of common stock valued at $4.00 per share. *Id.* The Form 8-K, dated November 22, 2004, indicates that the "number of shares surrendered was based upon a discount of 20% from the price of [Debtor's]

---

seven years after the transfer was made or the obligation was incurred. A trustee may bring a fraudulent transfer action if the state law statute of limitations has not expired as of the petition date, even if the period expires during the pendency of the bankruptcy case. *See In re Acequia, Inc.*, 34 F.3d 800, 807 (9th Cir. 1994).

common stock price as of the closing date." *Id*.  According to Mr. Robbins, Debtor applied the 20% discount from the market value because the shares were closely held and restricted as to trading.  Deposition of A.J. Robbins, 44:24-45:2.  Mr. Robbins further testified that the transaction was fair and appropriate under Generally Accepted Accounting Principles. *Id*., 45:2-9.  Raymond Skiptunis, the Debtor's chief financial officer after the reverse merger, testified that as of his involvement, Mr. Austin was no longer indebted to Debtor. Deposition of Raymond Skiptunis, 96:4-6.

## C.   *Secured Collateral Note*

Relying on a "Secured Collateral Note," dated December 31, 2003, the Trustee alleges that Mr. Austin received $1,934,260 in unauthorized officer withdrawals in the year 2003. *Plaintiff's Exhibit 571*.  The Secured Collateral Note provided that Mr. Austin would pay $2,614,550 to Debtor and Majestic Film Partners I, LP with accrued interest, as provided in Schedule 1 to the Secured Collateral Note. *Id*.  This promissory note apparently arises from the Officer Account Loans.

Schedule 1 to the Secured Collateral Note states the following related to the year 2003:

> Interest at the rate of 4.00% accruing for the 12 month period ending:
> December 31, 2003 on the principal amount of $1,934,260.

*Id*.

The Trustee contends that this portion of Schedule 1 demonstrates that Mr. Austin withdrew $1,934,260 in 2003.  There are several problems with this assertion.  First, the principal amount listed in Schedule 1 does not reflect the amount Mr. Austin withdrew in 2003.  Rather, it reflects the principal balance of the debt owed by Mr. Austin as of 2003, including amounts incurred between 1999 and 2002.  Schedule 1 indicates that, as of 2002, the principal balance was $1,824,185.  Regarding 2003, the increase in the balance to $1,934,260 indicates that Mr. Austin's debt increased by $110,075 that year.  Thus, the Secured Collateral Note reflected a debt increase of $110,075 in 2003, not a withdrawal of $1,934,260 in 2003.

The promissory note was signed and dated on December 31, 2003, significantly before Grobstein and A.J. Robbins computed the Officer Account Loans' final balance of $1,542,294.

No testimony was provided regarding the method and documentation used to compute the sums set forth in Schedule 1 of this promissory note.

Furthermore, the Secured Collateral Note is internally inconsistent. *Id*.  Schedule 1 states:

TOTAL NOW DUE: One Million Nine Hundred **Thirty Four Thousand Two Hundred** Sixty ($1,**951,7**60).

*Id*. (emphasis added). The alphabetical description of the total due to Debtor does not match the numbers in parentheses.  In light of these issues, the Court gives greater credence to the testimony and tax audit documentation about the Officer Account Loans than to this promissory note.  Either way, as of November 22, 2004 (the date Debtor filed the Form 8-K), Mr. Austin satisfied this debt owed to Debtor by the surrender of his shares.

**D.**     ***The Satellite Strategic Partners Financing***

After the reverse merger, Debtor entered into a stock financing agreement with Satellite Strategic Partners ("Satellite") to raise $5 million as working capital.  Some of the financing was used to produce movies in which Debtor held distribution rights. *Id*., 50:20-24.

On May 4, 2005, Satellite wired $3.795 million to Debtor. *Plaintiff's Exhibit 317*, p. 1784.  That day, Debtor wired $1 million out of its bank account. *Id*.  On May 5, 2005 and May 19, 2005, Debtor transferred another $500,000 and $350,000, respectively. *Id*.  The Trustee noted the following subsequent transfers from Debtor's accounts, after Debtor received the Satellite funds:

(1) On June 1, 2005, Debtor transferred $500,000 "from Corporate to Operating." *Id*., p. 1786.

(2) On July 12, 2005, Debtor transferred $400,000 to Debtor's operating account. *Id*., p. 1788.

(3) On July 26, 2005, Debtor transferred $250,000 to Debtor's entertainment account. *Id*.

(4) On August 1, 2005, Debtor transferred $250,000 to Debtor's entertainment account. *Id*., p. 1590.

(5) On September 14, 2005, Debtor received $200,000 from Goldstein & DiGioia, LLP, a

law firm retained by Debtor.  On September 15, 2005, Debtor wired $200,000 out of the

account. *Id.*, p. 1792.

Mr. Skiptunis testified that Debtor used $2 million of the Satellite financing to fund the

movie *Supercross*. Deposition of Raymond Skiptunis, 51:5-11.  According to Mr. Skiptunis, "the

business reason behind [the transfer to fund *Supercross*] was because [Debtor] had distribution

rights to *Supercross*, so it benefited [Debtor] to see that we … complete production because …

[Debtor would be] entitled to fees, royalties, commissions…." *Id.*, 51:14-21.  Mr. Skiptunis

represented that Debtor used the remainder of the Satellite funds as working capital. *Id.*, 52:17-

20.

Relying on Debtor's corporate tax returns, the Trustee asserted that Debtor was insolvent

during the relevant time periods.  From 2001 to 2003, Debtor's Form 1120 corporate tax returns

indicated that Debtor had negative taxable income.  *Plaintiff's Exhibits 395, 397, 399*.  Debtor's

2001 tax return showed a taxable income of -$630,642; Debtor's 2002 tax return showed a

taxable income of -$189,238; and Debtor's 2003 tax return showed a taxable income of -

$1,413,942. *Id*.  Mr. Levine, the certified public accountant from Grobstein, testified that the tax

returns displayed only Debtor's tax loss, not Debtor's financial or operating loss; consequently,

according to Mr. Levine, the corporate tax returns did not necessarily reflect that Debtor was

losing money on a financial loss basis.

Mr. Levine did testify that as of December 31, 2003, Debtor was insolvent.  This

testimony was corroborated by Debtor's Form 8-K filed with the SEC, which stated that Debtor

"has experienced recurring losses and negative cash flows from operations and has both a

working capital and a capital deficit at December 31, 2003." *Plaintiff's Exhibit 86*.  The form

also stated that this information "raise[d] substantial doubt about [Debtor's] ability to continue as

a going concern." *Id*.  Further, Form 8-K indicated that Debtor was operating at a $2,717,795

loss as of September 30, 2004. *Id*.  The Trustee did not present any other evidence regarding

Debtor's financial health for different periods of time.

Regarding Debtor's involvement in litigation, between 2002 and 2010, Debtor was a named defendant in 17 lawsuits.  Specifically, Debtor was actively involved as a defendant in litigation in the following time frames:

1) Between December 12, 2002 through January 30, 2004: two lawsuits;

2) Between May 10, 2004 and September 26, 2005: one lawsuit;

3) Between November 15, 2005 to August 19, 2010: fourteen lawsuits.

Eventually, Debtor went out of business.  According to Mr. Skiptunis, Debtor "ran out of money." Deposition of Raymond Skiptunis, 35:8-14.

### E.      *Background of Mr. Austin*

In 1999, Mr. Austin incorporated TAG, Inc. JPO, ¶ 4; *Plaintiff's Exhibit 131*, p. 61.  In June 2000, Mr. Austin married Kathleen Austin. JPO, ¶ 28.

From 1999 to June 2007, Mr. Austin was the Chief Executive Officer of Debtor and SAP. *Plaintiff's Exhibit 131*, p. 61.  Mr. Austin testified that he also was Debtor's President.  Mr. Austin has a real estate license; since 1980, he has purchased, remodeled and sold homes for profit. *Id*.

#### 1.      *Mr. Austin's Resignation and Subsequent Reinstatement*

In September 2001, Debtor's Board of Directors (the "Board") called a special meeting to discuss concerns about Mr. Austin. *Plaintiff's Exhibit 139*.  Specifically, the Board discussed allegations that Mr. Austin had failed to observe corporate formalities, made inappropriate advances to himself using corporate and partnership assets, stalled the Chief Financial Officer from obtaining bank records, commingled personal and corporate matters and disregarded directions of the Board.  *Id*.  Following this special meeting, Mr. Austin voluntarily resigned as an officer and director of Debtor and agreed to take a temporary leave of absence as an employee.  *Id*.  In a letter dated September 26, 2001, Mr. Austin confirmed his resignation. *Plaintiff's Exhibit 140*.

On January 10, 2002, Mr. Austin wrote a letter to the Board informing them that, as a majority shareholder, he would convene an annual meeting of shareholders and reinstate himself as an officer and director of Debtor.  *Plaintiff's Exhibit 141*.  In this letter, Mr. Austin discussed

several actions he would take upon his return, including hiring a Certified Public Accountant to review Debtor's books and records and to file corporate and partnership tax returns; designating counsel to review the offer and sale of equity in Debtor; paying or discharging all of Debtor's outstanding obligations; working with an independent administrator to create a "lock box" for all of the revenue from certain films; and designating counsel to review Debtor's structure and to implement an asset protection program. *Id.*

On January 14, 2002, the Board held a special meeting to discuss Mr. Austin's letter. *Id.* The minutes of this meeting indicate that the Board approved the actions proposed in Mr. Austin's letter. *Id.* Thus, after his relatively brief leave of absence, Mr. Austin was reinstated as an officer and director of Debtor.

### 2.    *Mr. Austin's Compensation From Debtor*

In 2004, Mr. Austin was authorized to receive a $500,000 salary and a $140,000 to $160,000 bonus from Debtor. However, Mr. Austin did not take a monthly or biweekly salary; rather, Mr. Austin "[drew] money out when he needed it" and "offset [the amount] against the salary due to him." Deposition of A.J. Robbins, 37:3-9.

In 2004, Debtor paid Mr. Austin $275,000 as salary; Mr. Austin's full salary, including a bonus, was $640,000. *Id.*, 50:4-9. According to Mr. Robbins, for the year 2004, Debtor owed Mr. Austin more than $360,000 in unpaid salary. *Id.*

In 2005, Debtor generated substantial funds through the Satellite financing. Deposition of Raymond Skiptunis, 49:8-19. Mr. Robbins represented that Mr. Austin was owed $215,201 by Debtor in connection with this private placement. Deposition of A.J. Robbins, 42:6-15.

### 3.    *Mr. Austin's Criminal Case*

From May 2004 through December 2006, Mr. Austin devised and participated in a scheme to defraud victims by "cold calling" individuals and inducing them to invest in films. *Plaintiff's Exhibit 123.* During the scheme, Mr. Austin owned and operated American Film Ventures, LLC ("AFV"), a company that claimed to offer investments into movies. *Id.*

Through AFV, Mr. Austin offered investments into a partnership named "Funny Money the Movie, LP" ("Funny Money LP"). *Id.* Mr. Austin informed potential investors that their

investment would be used to finance part of the development, production, marketing and distribution of a motion picture titled *Funny Money*. *Id*. According to the Presentence Investigation Report (the "Investigation Report") generated for Mr. Austin's criminal case, Mr. Austin knew that neither AFV nor Funny Money LP had any agreement to develop, produce, market or distribute the movie *Funny Money*. *Id*. In addition, the Investigation Report found that Mr. Austin knew that none of the money invested in Funny Money LP was spent on financing the *Funny Money* movie. *Id*. Through this scheme, an estimated 63 victims sent a total of approximately $2.4 million to AFV. *Id*. According to Ellyn Lindsay, the Assistant United States Attorney who tried Mr. Austin's criminal case, and Jeffrey Gonzalez (an interim Chief Financial Officer for Debtor), a large portion of these funds were taken by the telemarketers, including Mr. Austin, and characterized as a brokers' fee. Deposition of Jeffrey Gonzalez, 53:3-9.

The Investigation Report further found that Mr. Austin filed a false tax return for the year 2003. *Id*. In 2005, Mr. Austin and Mrs. Austin filed a joint Form 1040 for the 2003 tax year. *Id*. Mr. Austin reported that he and his wife had no taxable income. *Id*.

The Investigation Report stated that, contrary to this Form 1040, Mr. Austin had collected money from investors in 2003 and then deposited the funds into a Citibank account held in the name of SAP. *Id*. According to the Investigation Report, instead of using the money to fund production of movies,[6] Mr. Austin transferred the funds to personal bank accounts controlled by Mr. and Mrs. Austin. *Id*. Specifically, Mr. Austin transferred $309,000 from the SAP account to a bank account held in Mrs. Austin's name and $565,000 from the SAP account to a joint bank account held in the names of Mr. and Mrs. Austin. *Id*. The Investigation Report found that, in 2003, Mr. Austin transferred more than $870,000 of investor money to the SAP account, and then to the personal bank accounts held in his and Mrs. Austin's names. *Id*.

As set forth in the Investigation Report, through this scheme, Mr. Austin received significant income in 2003 by misappropriating investments intended to fund film production. However, during this time period (before Debtor became a publicly traded company in

---

[6] Although Mr. Austin was convicted for mail fraud related to *Funny Money* only, the District Court found that Mr. Austin's conduct was "part of a pattern" and "not a single occurrence." *Plaintiff's Exhibit 131*, p. 59.

November 2004), Debtor's filed corporate tax returns indicate that Mr. Austin received little

income directly from Debtor. *Plaintiff's Exhibits 395, 397, 399*.  For the years 2001 and 2002,

Debtor's federal corporate tax returns indicated that Debtor paid an aggregate of $512,609 (for

2001) and $16,921 (for 2002) in salaries and wages. *Plaintiff's Exhibit 395, 397*.[7]  If Mr. Austin

received the salaries and wages which Debtor reported to have paid in 2001 and 2002, the

Trustee did not demonstrate that the amount Mr. Austin received from Debtor during the relevant

time period exceeded Mr. Austin's payable salary.  For 2003, Debtor's federal corporate tax

return indicated that Debtor did not pay any money toward salaries and wages. *Plaintiff's Exhibit

399*.

Ms. Lindsay testified that in the typical movie mail fraud scheme, solicitors misuse

investment funds and then inform their victims that the movie did not garner profits as

anticipated.  Here, the Investigation Report discussed the loss suffered by victims of Mr.

Austin's fraudulent activities. *Plaintiff's Exhibit 123*.  The victims earned little or no return on

their investments. *Id*.  The Information filed by the United States in Mr. Austin's criminal case

also noted that the victims did not earn any return on their investments. *Plaintiff's Exhibit 121*.

### 4.    *Mr. Austin's Restitution Payment*

On September 27, 2007, the United States charged Mr. Austin with mail fraud and

subscribing to a false tax return. JPO, ¶ 114.  According to Ms. Lindsay, the United States

approached Mr. Austin early in the investigation and negotiated that Mr. Austin would plead to a

limited aspect[8] of the mail fraud and provide restitution to his victims.

On March 17, 2008, Mr. Austin pleaded guilty to both mail fraud and filing a false tax

return. *Plaintiff's Exhibit 123*.  Pursuant to this plea agreement, Mr. Austin agreed to refund the

full amount of the initial investments made by investors in all movies produced by Mr. Austin in

the ten years prior to the plea agreement.  JPO, ¶ 119.  Mr. Austin also agreed to liquidate or

assign to the United States real property he owned in Montana and two film libraries. *Id*., ¶ 121.

---

[7] These corporate tax returns do not specify *which* employees received salaries or wages from Debtor.
[8] Ms. Lindsay testified that Mr. Austin's fraudulent scheme included more than the movie *Funny Money*, but that the government did not conclude that the fraud extended to every movie produced by Mr. Austin.

On May 31, 2007, Mrs. Austin sold the Colony Property (the Austins' residence in Malibu) for $13.8 million. *Id.*, ¶ 71. On June 10, 2009, Joel R. Isaacson, one of Mr. Austin's attorneys, transferred $2,751,390 to the Clerk of the United States District Court, Central District of California (the "Clerk of Court"). *Id.*, ¶ 111. Later that day, Mr. Isaacson transferred an additional $3,238,609 to the Clerk of Court. *Id.*, ¶ 112.

The Trustee and the United States do not dispute that Mr. Austin made his restitution payment from the sale proceeds of the Colony Property, as described in further detail below. Pursuant to the judgment of the District Court, the Clerk of Court has distributed approximately $5.5 million from these funds as restitution to victims.

On August 13, 2009, Mr. Austin was sentenced to 36 months of imprisonment and restitution in the amount of $17,332,971.14.[9] *Id.*, ¶ 122; *Plaintiff's Exhibit 123*.

## F.    *The Austins' Real Estate Transactions*

### 1.    *Purchase of the Valleyheart Property*

On August 17, 2001, Mrs. Austin purchased real property located at 12055 Valleyheart Drive in Studio City, California (the "Valleyheart Property").[10] *Plaintiff's Exhibit 75.* Mrs. Austin purchased the Valleyheart Property for $550,000. JPO, ¶ 31.[11] On November 2, 2001, Mrs. Austin sold her prior residence (which she acquired before she married Mr. Austin), located in Van Nuys, California, for $500,000. *Plaintiff's Exhibit 447.*

---

[9] Although the Investigation Report lists the amount of restitution at $17,332,971.14, Ms. Lindsay testified that the United States later determined that an additional $30 million should be added to that amount. According to Ms. Lindsay, Mr. Austin hired an analyst who computed the $17,332,971.14 figure, and the United States recalculated the amount at a later date.

[10] The grant deeds regarding the real property transfers indicate that the properties were solely in Mrs. Austin's name when they were sold or purchased. However, certain properties were deeded back and forth from Mrs. Austin to Mr. Austin. For instance, on January 10, 2006, the Kasten 2004 Trust, for which Mrs. Austin was the trustee, deeded one of the Austins' properties on the Pacific Coast Highway to Mr. Austin. JPO, ¶ 41. On July 13, 2006, Mrs. Austin deeded the property located on Malibu Colony Road to Mr. Austin and Mrs. Austin as joint tenants for the purpose of applying for a loan. *Id.*, ¶¶ 69-70. The United States argued that Mr. Austin did not have any interest in the real properties at issue. Because the extent of Mr. Austin's interest is unclear, *e.g.*, whether Mr. Austin became entitled to a community property interest as a result of making deed of trust payments, the Court's analysis assumes that Mr. Austin held a community or other beneficial or equitable interest in the properties.

[11] During her deposition, Mrs. Austin acknowledged that Mr. Austin made mortgage payments on the Valleyheart Property. Deposition of Kathleen Austin, 23:19–24:2.

### 2.    Purchase of the Malibu Road Property

In late April 2003, Mrs. Austin purchased real property located at 24748 Malibu Road in Malibu, California (the "Malibu Road Property") for $2.25 million. JPO, ¶ 35.  Mrs. Austin purchased the Malibu Road Property using the following funds: (1) a January 8, 2003 $100,000 deposit from Mr. Austin; (2) a January 13, 2003 $20,000 deposit from Mrs. Austin; (3) another $475,000 deposit from Mrs. Austin; and (4) a $1,687,500 loan from Washington Mutual Bank, F.A. (the "WaMu Loan"), secured by a lien on the Malibu Road Property.  *Id.*, ¶ 36; *Plaintiff's Exhibit 449*.  According to Mr. Austin, the $475,000 deposit came from a bridge loan which was repaid upon the sale of the Valleyheart Property in February 2004.[12]

### 3.    Sale of the Valleyheart Property

Between April 2003 and February 2004, Mrs. Austin received rental income from the Valleyheart Property. JPO, ¶ 33.  On February 27, 2004, Mrs. Austin sold the Valleyheart Property, at a significant profit.  *Id.*, ¶ 34.  Mr. Austin testified that the Valleyheart Property was sold for approximately $1.5 million, *i.e.*, approximately $1 million more than the purchase price.

### 4.    Purchase of the PCH Property

On April 8, 2004, Mrs. Austin, as trustee of the Kasten 2004 Trust, purchased real property located at 20540 Pacific Coast Highway in Malibu, California (the "PCH Property") for $1.66 million. JPO, ¶ 39.  The closing statement for this purchase indicates that four deposits were made to purchase the PCH Property: (1) $49,800 by Mrs. Austin; (2) a $15,000 deposit which was identified as "Credit to Buyer non rec c/c" on the closing statement; and (3) one $1,545,300 payment and one $59,700 payment listed as "Buyers deposit with title" on the closing statement. *Plaintiff's Exhibit 318*.  There is no evidence of the Austins receiving loans secured by the PCH Property until November 2004.[13]

---

[12] As set forth in the Investigation Report, at the time that Mrs. Austin deposited $475,000 for the purchase of the Malibu Road Property, the Austins were receiving large sums of money through Mr. Austin's mail fraud scheme.
[13] Mr. Austin testified that Harvey Vechery, who also had loaned money to fund films produced by Mr. Austin, loaned the money to purchase the PCH Property.

### 5.    Sale of the Malibu Road Property

On November 17, 2004, Mrs. Austin sold the Malibu Road Property for $4.3 million. JPO, ¶ 37; *Plaintiff's Exhibit 78*.  The sale proceeds were used as follows: (1) approximately $1.64 million to pay off the WaMu Loan (which encumbered the Malibu Road Property); (2) approximately $254,000 to pay costs of sale; and (3) approximately $2.42 million to fund the purchase of the Austins' next residence, the Colony Property. JPO, ¶ 38.

### 6.    Purchase of the Colony Property

On November 17, 2004, Mrs. Austin purchased the Colony Property. *Id*., ¶ 45; *Plaintiff's Exhibit 450*.  Mrs. Austin purchased the Colony Property using the following funds: (1) a $4 million loan from Countrywide; (2) a $250,000 cash deposit by Mrs. Austin; (3) a $2,418,530.98 deposit by Malibu Escrow Corp., which originated from the proceeds of the sale of the Malibu Road Property; and (4) a $2.5 million deposit by Charles E. Ruben and Associates.  JPO, ¶ 46; *Plaintiff's Exhibit 451*.

As concerns the $2.5 million deposit by Charles E. Ruben and Associates, these funds originated from loans made by the Vechery Family Trust (the "Vechery Trust").  *Plaintiff's Exhibits 539, 540*.  On November 24, 2004, Mr. Austin executed a promissory note, in favor of the Vechery Trust, for $2 million plus 10% interest. JPO, ¶ 49.  That day, to secure this $2 million note, Mrs. Austin (as trustee of the Kasten 2004 Trust), executed a short form deed of trust and assignment of rents against the PCH Property.  *Id*., ¶ 50.

On November 26, 2004, Mr. Austin executed a second promissory note in favor of the Vechery Trust for $500,000 plus 10% interest.  *Id*., ¶ 51.  That day, to secure this $500,000 note, Mrs. Austin executed a short form second deed of trust and assignment of rents against the Colony Property. *Id*.,        ¶ 52.

On November 29, 2004, the Vechery Trust wired $2.5 million to a Comerica Bank account titled to Charles E. Ruben, an attorney. *Id*., ¶ 53.  The closing statement for the purchase of the Colony Property reflected a $992,324.89 check issued to East West Bank. *Plaintiff's Exhibit 473*.  The check includes a notation that the funds were for "outgoing wire to Comerica

Bank for credit to Charles E. Ruben and Associates Client Trust Account." *Id*.  The Trustee

contends that this check was a buyer's refund transferred to Mrs. Austin.

In July 2006, Mr. Austin paid the Vechery Trust $583,013.70. JPO, ¶ 58.  In doing so,

Mr. Austin repaid in full the $500,000 loan from the Vechery Trust, which was secured by the

Colony Property. *Id*.[14]

### 7.    Sale of the PCH Property

On January 10, 2006, the Kasten 2004 Trust deeded the PCH Property to Mr. Austin. *Id*.,

¶ 41.  On January 12, 2006, Mr. Austin received a $1.92 million loan from Americorp Funding,

secured by a deed of trust against the PCH Property. *Id*., ¶ 42.  Apparently, this loan was used to

pay down the Vechery Trust's $2 million loan, secured by the PCH Property.  The remainder of

the Vechery Trust's $2 million secured loan apparently was subordinated to the Americorp loan

(also secured by the PCH Property). *Id*., ¶ 44; *Plaintiff's Exhibit 547*.

On January 24, 2006, Mr. Austin sold the PCH Property for $2.425 million. *Plaintiff's

Exhibit 547*.  On January 25, 2006, the Harvey T. and Linda M. Vechery Bel Air Securities

account received $1.92 million. JPO, ¶ 55.  The deposit was applied towards the repayment of

the $2 million loan from the Vechery Trust, secured by the PCH Property. *Id*.  On April 12,

2006, Mr. Austin transferred another $200,000 from Malibu Escrow to the Vechery Trust. *Id*., ¶

56.  Between August 2006 and January 2007, Mr. Austin, through SAP, made monthly payments

on the $2 million loan by the Vechery Trust. *Id*., ¶¶ 59-68.  During this period, Mr. Austin

transferred a total of $197,000 from the SAP account to the Vechery Trust. *Id*.

### 8.    Sale of the Colony Property

On May 31, 2007, Mrs. Austin sold the Colony Property for $13.8 million. *Id*., ¶ 71.

From the sale of the Colony Property, the Austins received a net amount of $7,317,633.22.

*Plaintiff's Exhibit 485*.  On the same day, Mrs. Austin deposited $3,658,816.61 into a City

National Bank account titled "Joel R. Isaacson, Attorney at Law, Client Trust Account FBO

---

[14] This payment occurred when Mr. Austin was engaged in the fraud for which he was convicted.  As such, Mr.
Austin was receiving substantial amounts from movie investors, whose investment funds were transferred to the
Austins through limited partnerships, rather than through Debtor.

Kathleen Austin." JPO, ¶ 73.  Additionally, Mrs. Austin transferred another $3,658,816.61 from the proceeds of sale to a second City National Bank account titled "Joel R. Isaacson, Attorney at Law, Client Trust Account FBO Kathleen Austin or Steve Austin." *Id.*, ¶ 74.  On December 31, 2007, Mrs. Austin assigned all sums in her name in these accounts to Mr. Austin. *Plaintiff's Exhibit 171*.

On June 10, 2009, Mr. Isaacson transferred $3,238,609 and $2,751,390 to the Clerk of Court. *Id.*, ¶¶ 111-112.  As noted above, the Trustee and the United States do not dispute that Mr. Austin paid the restitution money from the proceeds of the sale of the Colony Property.

## G.    *Other Relevant Transfers*

### 1.    *The Vechery Trust Loans to Limited Partnerships*

On June 10, 2004, Supercross the Movie, LP and the Vechery Trust entered into a "Loan and Security Agreement" (the "Supercross Agreement").  *Plaintiff's Exhibit 490*.  The Supercross Agreement provided that the Vechery Trust would lend $1 million to finance the motion picture titled *Supercross: The Movie* with interest at 10% per annum. *Id.*  The Supercross Agreement also provided that the loan would be secured by Debtor's film library. *Id.*  The Supercross Agreement includes a notation that the loan was "paid in full." *Id.*

On August 9, 2004, the Vechery Trust entered into a similar agreement with Downtown the Movie, LP (the "Downtown Agreement"). *Plaintiff's Exhibit 530*.  The Downtown Agreement provided that the Vechery Trust would loan Downtown the Movie, LP $1 million at an interest rate of 10% per annum. *Id.*  As with the Supercross Agreement, the Downtown Agreement was secured by Debtor's film library. *Id.*  The Downtown Agreement also included a handwritten notation that the loan had been paid in full. *Id.*  Debtor guaranteed the Downtown Agreement. *Plaintiff's Exhibit 535*.

The Trustee presented several checks made out to the Vechery Trust, allegedly evidencing repayment of these loans. *Plaintiff's Exhibits 505, 513, 514*.  The checks indicate that the payments were made by Supercross the Movie, LP or Debtor. *Id.*  Specifically, on October 7, 2004, Debtor issued a check in favor of the Vechery Trust in the amount of $8,333. *Plaintiff's Exhibit 514*.  The check does not state the purpose of the payment. *Id.*

The Trustee asserts that Debtor paid this amount as an interest payment on the Vechery Trust's loans for the purchase of the Colony Property. The evidence contradicts this assertion. First, the Vechery Trust made these loans (the "Colony Property Acquisition Loans") in late November 2004, more than one month after Debtor made the $8,333 payment. JPO, ¶¶ 49-50. Second, the Supercross Agreement and the Downtown Agreement called for interest at 10% per annum. *Plaintiff's Exhibit 490*. Thus, pursuant to this provision, Supercross the Movie, LP and Downtown the Movie, LP each owed the Vechery Trust $8,333 per month in interest payments. *Id*. As a result, it appears Debtor made the $8,333 payment to the Vechery Trust in satisfaction of an interest payment on the $1 million loan to either Supercross the Movie, LP or Downtown the Movie, LP, *not* as an interest payment on the Colony Property Acquisition Loans.

The Trustee also noted a Comerica Bank check dated October 8, 2004 and made in favor of the Vechery Trust in the amount of $500,000. *Plaintiff's Exhibit 513*. The Trustee argues that Mr. Austin testified that Debtor had an account at Comerica Bank. Aside from this testimony, there is no evidence that the $500,000 came from Debtor. In fact, Mr. Austin and Mr. Ruben both testified that Mr. Ruben also maintained an account at Comerica Bank. Mr. Ruben had previously represented the Vechery Trust, Debtor and Mr. Austin, individually. *Plaintiff's Exhibit 492*. Mr. Austin and the Vechery Trust used Mr. Ruben's Comerica Bank account to wire money to Malibu Escrow for the purchase of the Colony Property. Thus, it is unclear if the Comerica Bank check originated from an account held by Debtor at Comerica Bank or if it originated from Mr. Austin using Mr. Ruben's client account at Comerica Bank.

### 2. *Debtor's Transfers to SAP*

On September 21, 2005, Debtor received $200,000 from Goldstein & DiGioia, LLP. On September 23, 2005, Debtor transferred $100,000 to an operating account and another $100,000 to an unspecified account as "compensation." *Plaintiff's Exhibit 317*. On September 23, 2005, SAP received $100,000 by wire transfer from Debtor. *Id*., p. 863. On March 15, 2006 and April 4, 2006, Debtor made additional wire transfers, in the amount of $20,000 each, to SAP. *Id*., p. 891.

In 2006 and 2007, Debtor also issued several checks to SAP, payable from Debtor's Bank of America account:

(1) November 29, 2006 payment from Debtor to SAP in the amount of $20,000;

(2) November 29, 2006 payment from Debtor to SAP in the amount of $25,000;

(3) January 17, 2007 payment from Debtor to SAP in the amount of $25,000;

(4) February 6, 2007 payment from Debtor to SAP in the amount of $3,500;

(5) February 15, 2007 payment from Debtor to SAP in the amount of $31,263.31;

(6) March 9, 2007 payment from Debtor to SAP in the amount of $20,000;

(7) April 10, 2007 payment from Debtor to SAP in the amount of $10,000.

*Plaintiff's Exhibit 317*, pp. 201, 272, 276, 303, 325.  Thus, between November 29, 2006 and April 10, 2007, Debtor transferred a total of $134,763.31 to SAP.

With respect to these transfers, Mr. Austin testified that they were either compensation Debtor owed to him or production advances to be spent on movies.  As Mr. Robbins testified, Mr. Austin would not take regular salary payments and instead would withdraw amounts owed to him as needed.

Without identifying the source, the Trustee also presented evidence of deposits in 2005 and 2006 into the Austins' personal accounts. *Plaintiff's Exhibit 317*.  The Austins testified that these deposits were either income from Mr. Austin's job, production advances or rental income from the Austins' real property located in Whitefish, Montana.

**H.**     ***Debtor's Bankruptcy Case and the Adversary Proceeding***

On December 16, 2009, Debtor filed a voluntary chapter 7 petition.  The claims register indicates that, as of the petition date, Debtor had 12 unsecured creditors.

On August 11, 2010, the Trustee filed her complaint against the United States, initiating this adversary proceeding.  On July 22, 2011, the Trustee filed an amended complaint.

The Trustee alleges that the restitution money paid to the United States is traceable to Debtor and may be recovered as a fraudulent transfer under 11 U.S.C. § 544(b) and California's Uniform Fraudulent Transfer Act ("CUFTA").  The Trustee also alleges that Mr. Austin's criminal enterprise was a Ponzi scheme involving Debtor.  The United States asserts that the

Trustee has failed to show transfers originating from Debtor.  As a defense, the United States also raises the statute of limitations set forth in Cal. Civ. Code § 3439.09.

On December 20, 2013, the parties filed the Joint Pretrial Order [doc. 137].  The parties did not include the statute of limitations as an issue to be tried.  On June 16, 2014, the Trustee filed a trial brief [doc. 154].  On July 7, 2014, the United States filed its trial brief [doc. 164].  In this trial brief, the United States raised the statute of limitations defense for the first time.  On July 15, 2014, the Trustee filed a reply brief [doc. 178], arguing, *inter alia*, that the United States waived the statute of limitations because it did not previously raise the defense and did not include this defense in the Joint Pretrial Order.

## III.   LEGAL STANDARDS

### A.   *Avoiding a Transfer under 11 U.S.C. § 544(b)*

Under 11 U.S.C. § 544(b), the Trustee may avoid a transfer of an interest in property of the debtor that is voidable under applicable law by a creditor holding an allowable, unsecured claim.  Pursuant to § 544(b)(1), "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b)(1).  "[T]he Trustee has the burden of proving the elements of a fraudulent transfer by a preponderance of the evidence." *In re 3dfx Interactive, Inc.*, 389 B.R. 842, 863 (Bankr. N.D. Cal. 2008) *subsequently aff'd sub nom. In re 3DFX Interactive, Inc.*, 585 F. App'x 626 (9th Cir. 2014).

"Under section 544(b)(1), the plaintiff trustee succeeds to the rights of an actual unsecured creditor existing at the commencement of the case and has the authority to prosecute that creditor's state law fraudulent transfer actions.  The trustee need not identify a specific unsecured creditor, as long as an unsecured creditor exists." *In re Maui Indus. Loan & Fin. Co.*, 477 B.R. 134, 143 (Bankr. D. Haw. 2012); *see also In re Acequia, Inc.*, 34 F.3d 800, 809 (9th Cir. 1994) (quoting *In re Agric. Research & Tech. Grp., Inc.*, 916 F.2d 528, 534 (9th Cir. 1990)).

"[A]fter demonstrating the *right* to recover conveyances under 544(b), a trustee must then establish the *amount* of recovery under section 550(a) of the Bankruptcy Code." *Id.* (emphasis in

case).  "Thus, '[w]hile the transfer or obligation must be voidable as against a creditor holding an

allowable claim, *the measure and distributions of recovery is not limited by the creditor's*

*right*.'" *Id*. (emphasis in case) (quoting 4 *Collier on Bankruptcy* ¶ 548.02[5] at p. 10015-16 (15th

ed. 1994)).

### *1. Interest of the Debtor in Property*

"The § 544(b) requirement of a transfer of 'an interest of the debtor in property,"… refers

to property that would have been part of the estate had it not been transferred before

bankruptcy." *In re Beverly*, 374 B.R. 221, 233 (B.A.P. 9th Cir. 2007) (citing *Begier v. I.R.S.*, 496

U.S. 53, 58 (1990)).  11 U.S.C. 541(a)(1) defines "property of the estate" as including "all legal

or equitable interests of the debtor in property."

Although the Bankruptcy Code provides the definition of "transfer," the nature and extent

of a debtor's interest in property is determined by reference to state law. *In re Costas*, 555 F.3d

790, 793 (9th Cir. 2009); *see also Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59

L.Ed.2d 136 (1979) ("Property interests are created and defined by state law.").  The California

Uniform Fraudulent Transfer Act defines "property" as "anything that may the subject of

ownership," and states that "[p]roperty includes both real and personal property, whether

tangible or intangible, and any interest in property, whether legal or equitable." Cal. Civ. Code §

3439.01(h), cmt. 8.

### *2. Transfers Voidable under Applicable State Law*

Cal. Civ. Code § 3439.04(a)(1) provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether
the creditor's claim arose before or after the transfer was made or the obligation
was incurred, if the debtor made the transfer or incurred the obligation as
follows:
(1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

Cal. Civ. Code § 3439.01(i) defines a "transfer" as "every mode, direct or indirect,

absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an

interest in an asset, and includes payment of money, release, lease and creation of a lien or other

encumbrance."

"Whether there is actual intent to hinder, delay, or defraud under UFTA is a question of

fact to be determined by a preponderance of evidence." *Beverly*, 374 B.R. at 235 (citing *Filip v.*

*Bucurenciu*, 129 Cal.App.4th 825, 890 (Ct. App. 2002)). "The focus is on the intent of the

transferor. While intent to defraud is the usual rubric, the intended effect of the transfer need

only be hindrance of a creditor or delay of a creditor. Any of the three—intent to hinder, intent to

delay, or intent to defraud—qualifies a transfer for UFTA avoidance, even if adequate

consideration is paid by someone other than a good faith transferee for reasonably equivalent

value." *Id*.

 To determine whether the debtor made a transfer with actual intent to hinder,

delay, or defraud any creditor under Cal. Civ. Code § 3439.04(a)(1), courts look at the

factors listed in Cal. Civ. Code § 3439.04(b), including whether:

1)     The transfer or obligation was to an insider;

2)     The debtor retained possession or control of the property transferred after the

transfer;

3)     The transfer or obligation was disclosed or concealed;

4)     Before the transfer was made or obligation was incurred, the debtor had been sued

or threatened with suit;

5)     The transfer was of substantially all the debtor's assets;

6)     The debtor absconded;

7)     The debtor removed or concealed assets;

8)     The value of the consideration received by the debtor was reasonably equivalent to

the value of the asset transferred or the amount of the obligation incurred;

9)     The debtor was insolvent or became insolvent shortly after the transfer was made

or the obligation was incurred;

10)     The transfer occurred shortly before or shortly after a substantial debt was

incurred; and

11)    The debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

"'There is no minimum number of factors that must be present before the scales tip in favor of finding of actual intent to defraud. This list of factors is meant to provide guidance for the trial court, not compel a finding one way or the other.'" *In re Still*, 393 B.R. 896, 917 (Bankr. C.D. Cal. 2008) (quoting *Filip*, 129 Cal.App.4th at 834). "A trier of fact is entitled to find actual intent based on the evidence in the case, even if no 'badges of fraud' are present. Conversely, specific evidence may negate an inference of fraud notwithstanding the presence of a number of 'badges of fraud.'" *Beverly*, 374 B.R. at 236 (citing *Filip*, 129 Cal.App.4th at 834).

### 3.    Timing Limitations Under 11 U.S.C. § 546(a) and CUFTA

Pursuant to 11 U.S.C. § 546(a)—

An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—
(1) the later of—

    (A) 2 years after the entry of the order for relief; or

    (B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or
(2) the time the case is closed or dismissed.

*See also In re EPD Inv. Co., LLC ("EPD")*, 523 B.R. 680, 685 (B.A.P. 9th Cir. 2015).

[S]o long as the state-law fraudulent transfer claim exists on the petition date (or the order for relief date), the state statutes of limitations cease to have any continued effect, and the only applicable statute of limitations for bringing the claim thereafter is within § 546(a). Accordingly, the reach back period is established on the petition date (or the order for relief date) and encompasses all transfers within the relevant period provided by state law.

*Id.*, at 686.

Pursuant to Cal. Civ. Code § 3439.09—

A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought pursuant to subdivision (a) of Section 3439.07 or levy made as provided in subdivision (b) or (c) of Section 3439.07:

(a) Under paragraph (1) of subdivision (a) of Section 3439.04, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant.

…

(c) Notwithstanding any other provision of law, a cause of action with respect to a fraudulent transfer or obligation is extinguished if no action is brought or levy made within seven years after the transfer was made or the obligation was incurred.

Cal. Civ. Code § 3439.09(a) and (b) are statutes of limitation. *EPD*, 523 B.R. at 685.  "In contrast to subdivisions (a) and (b), the seven year time limitation set forth in Cal. Civ. Code § 3439.09(c) is a statute of repose." *Id.*, at 686.  "Unlike a traditional statute of limitations, a statute of repose cannot be waived." *Donell v. Keppers*, 835 F.Supp.2d 871, 877 (S.D. Cal. 2011).

### 4. Establishing Intent to Defraud Through a Ponzi Scheme

In *Agricultural Research*, 916 F.2d at 531, the Ninth Circuit Court of Appeals described a Ponzi scheme as follows:

A Ponzi scheme is an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected. The fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit making business opportunity exists, where in fact no such opportunity exists.

*Id.* (citing *Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924)).  In Ponzi schemes, "a fraud victim's money is both an instrumentality and the proceeds of the crime." *United States v. Wilson*, 659 F.3d 947, 953 (9th Cir. 2011).

"Courts have routinely applied UFTA to allow receivers or trustees in bankruptcy to recover monies lost by Ponzi-scheme investors.  The Ponzi scheme operator is the 'debtor,' and each investor is a 'creditor.'  The profiting investors are the recipients of the Ponzi scheme operator's fraudulent transfer." *Donell v. Kowell*, 533 F.3d 762, 767 (9th Cir. 2008).  "The mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud." *Id.*, at 770; *see also In re AFI Holding, Inc.*, 525 F.3d 700, 704 (9th Cir. 2008).

### 5.    *Tracing Transfers*

The Trustee relies on *In re International Administrative Services, Inc.*, 408 F.3d 689

(11th Cir. 2005), for the proposition that "proper tracing does not require dollar-for-dollar

accounting." *International Administrative*, at 708.  There, debtor-corporation International

Administrative Services, Inc. ("IAS") specialized in "get-rich-quick" schemes; IAS would

provide clients with information on how to increase wealth and collect substantial annual dues

and membership fees in return. *Id.*, at 695.  Eventually, several members initiated lawsuits

against IAS. *Id.*  Concurrently, the SEC commenced an investigation into securities fraud claims

against IAS. *Id.*

In order to protect its assets, IAS hired David H. Tedder, an attorney, to form a plan to

shield IAS from creditors. *Id.*, at 696.  The Eleventh Circuit Court of Appeals summarized the

transactions as follows:

> First, assets were transferred to various Tedder-owned foreign and domestic
> entities. Tedder then recycled the assets through a tangled and complex web of
> multi-step international transactions. In total, Tedder transferred assets more than
> one hundred times among twenty-three different entities. Between January 1992
> and 1996, Givens removed a treasure chest in excess of $50 million from IAS'
> coffers; putting it out of the direct reach of IAS' creditors.

*Id.*  Once the assets were purged, IAS filed a chapter 11 petition. *Id.*  IAS' plan of reorganization

called for a trustee to litigate fraudulent transfer claims. *Id.*, at 696 n.2.  After trial, the

bankruptcy court found that the funds received by defendant-transferees had originated from IAS

after being disbursed via Mr. Tedder's asset protection plan. *Id.*, at 697.  In affirming the

bankruptcy court, the Eleventh Circuit Court of Appeals stated:

> In an action seeking recovery, the plaintiff has the burden of tracing funds it
> claims to be property of the estate. Although we agree with this proposition, it is
> also true that proper tracing does not require dollar-for-dollar accounting. The
> bankruptcy court determined that the Trustee successfully proved by a
> preponderance of the evidence that the $1.050 million transferred to IBT from the
> Van Dan accounts, *originated solely with IAS*. We cannot find that conclusion
> clearly erroneous. Givens and Tedder perpetrated a fraud that can only be
> described as massive. It is not fatal to the Trustee's case that dollar for dollar, the
> exact funds cannot be traced.

*Id.*, at 708 (emphasis added).  Unlike *IAS*, in which case the transfers clearly originated from the

debtor, if a plaintiff presents only attenuated links between the debtor and the ultimate transferee,

the evidence is insufficient to make a showing under CUFTA. *See, e.g.*, *Kremen v. Cohen*, 2012 WL 2919332 (N.D. Cal. July 17, 2012).

In *Kremen*, the plaintiff obtained a $65 million judgment against Stephen Cohen. *Kremen*, at *1.  After several attempts to collect from Mr. Cohen, the plaintiff filed an action under CUFTA against two defendants, Mr. Cohen's cousin (the "Cousin") and FNBPay, a corporation created by the Cousin. *Id.*, at *1-2.  The plaintiff alleged that the Cousin formed FNBPay to assist Mr. Cohen in funneling money to conceal assets; that Mr. Cohen used FNBPay to conduct business for his own benefit; and that Mr. Cohen directed the withdrawals and transfers of funds into and out of a specific Wells Fargo bank account opened by the Cousin under the name FNBPay. *Id.*, at *2.

The plaintiff argued that, although he lacked direct evidence of a transfer of assets from Mr. Cohen to defendants, the circumstantial evidence of the "various business and personal connections between [Mr. Cohen] and Defendants" was sufficient to show that the funds in the Wells Fargo account originated from Mr. Cohen. *Id.*, at *4.  The circumstantial evidence presented by the plaintiff included the following:

(1) the Cousin was one of the defendants;

(2)  the Cousin owned 100% of FNBPay;

(3)  Mr. Cohen owned FNB Mexico;

(4) the Cousin admitted to operating a credit card processing business using the Wells Fargo account, together with his associate, who was the Chairman of the Board of FNB Mexico;

(5) FNBPay.com operated as the credit card processing arm of FNB Mexico and was a wholly owned subsidiary of FNB Mexico;

(6) the FNBPay.com website instructed United States users who wishes to wire or deposit funds to FNBPay.com to wire their money to the Wells Fargo account;

(7) FNB Mexico had used the same mailing address as the address listed on the Wells Fargo account;

(8) the Cousin applied for and opened the Wells Fargo account under the business name

FNBPay using Mr. Cohen's social security number;

(9) Mr. Cohen had a history of using relatives and other associates to help him divert and

conceal assets with intent to hinder, delay or defraud the plaintiff; and

(10)    between August 31, 2011 and January 1, 2012, at least $200,000 was transferred

into and out of the Wells Fargo account.

*Id*.

In finding that the plaintiff had not sufficiently shown that transfers flowed from Mr.

Cohen to the defendants, the *Kremen* court stated:

> While the Court acknowledges that Plaintiff's evidence may be relevant to a fact
> finder's determination of fraudulent intent, the Court disagrees with Plaintiff that
> these attenuated links are sufficient to raise a triable issue of fact as to whether a
> transfer of assets from S. Cohen to Defendants in fact ever occurred, which is a
> threshold element of Plaintiff's UFTA claims. *See* Cal. Civ.Code § 3439.04(a)(1).
> While it is evident that Plaintiff believes the Wells Fargo Account has been a
> conduit for fraudulent transfers of assets, the bank records themselves reveal very
> little about the sources and recipients of the deposited and withdrawn funds. It is
> not clear whether S. Cohen ever supplied, or M. Cohen ever received, funds via
> the Wells Fargo Account, and Plaintiff has directed the Court to no other evidence
> of an alternative conduit through which any alleged fraudulent transfer between S.
> Cohen and Defendants might have occurred.

*Id*., at *5.

## B.  *What Constitutes a Transferee*

Although the Bankruptcy Code does not define the term "transferee," courts apply "the

so-called 'dominion test.'" *In re Mortgage Store, Inc.*, 773 F.3d 990, 995 (9th Cir. 2014).

"Under the dominion test, a transferee is one who has dominion over the money or other asset,

the right to put the money to one's own purposes." *In re Incomnet, Inc.*, 463 F.3d 1064, 1070

(9th Cir. 2006) (internal quotations omitted).  "The inquiry focuses on whether an entity had

legal authority over the money and the right to use the money however it wished." *Id*.

In *Incomnet*, the committee of unsecured creditors (the "Committee") of a chapter 11

debtor brought a preference avoidance proceeding against the Universal Administrative

Company ("USAC"), a nonprofit corporation. *Id*., at 1067.  After Congress gave the Federal

Communications Commission ("FCC") authority to implement certain universal service support

provisions of the Telecommunications Act (the "Act"), the FCC designated USAC to collect,

pool, and disburse the universal service support funds. *Id*.  The debtor, a telecommunications

carrier subject to these provisions of the Act, contributed to the universal service fund by sending

payments to USAC. *Id*.  After the debtor filed a chapter 11 petition, the Committee initiated an

adversary proceeding against USAC, alleging that the debtor's payments to USAC in compliance

with the Act constituted preferential transfers under 11 U.S.C. § 547(b) and that the Committee

could recover from USAC under 11 U.S.C. § 550(a). *Id*.

    The bankruptcy court found that USAC did not have dominion over the funds because it

did not have the degree of "unfettered control" over the funds to qualify as a transferee. *Id*., at

1068.  The Ninth Circuit Court of Appeals reversed, finding that complete "unfettered control"

was not a prerequisite to an entity exercising dominion over assets:

> Finally, it is of no consequence that USAC cannot invest funds in—to use the
> Seventh Circuit's colorful phrase—"lottery tickets or uranium stocks." Here,
> USAC received the funds from Incomnet without any restrictions *from Incomnet*
> on their use. USAC commanded those funds and, like other individuals, its use of
> those funds was restricted by law. These legal restrictions merely limit how
> USAC will exercise its dominion over the funds; they do not preclude USAC
> from having dominion at all.

*Id*., at 1075 (emphasis in case) (quoting *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838

F.2d 890, 894 (7th Cir. 1988)).  The Court of Appeals also surveyed cases within the circuit:

> In cases from within our circuit, other government entities have been found to be
> initial transferees even though they were subject to statutes and regulations
> governing their use of the funds given them. For example, in *In re California
> Trade Technical Schools, Inc.,* 923 F.2d 641, California Trade Technical Schools
> ("CTTS") received federal financial aid funds from the Department of Education.
> CTTS was obligated to hold these funds in trust for student recipients, but it
> improperly diverted them to operating expenses. The Department of Education
> demanded return of the diverted funds. *See id.* at 645. When CTTS made
> payments to the Department of Education to correct this, we treated the
> department as the initial transferee of the repaid funds, even though the funds
> might be obligated to specific students in the future. *Id.* at 647 & n. 9. Similarly,
> in *In re M. Blackburn Mitchell, Inc.*, 164 B.R. at 130, and *Kupetz v. United States*
> (*In re Williams*), 104 B.R. 296, 298 (Bankr.C.D.Cal.1989), debtors had made
> payments to the FDIC and the IRS, respectively, and bankruptcy courts in
> California found these agencies to be initial transferees under 11 U.S.C. §
> 550(a)(1).

*Id*.

### C. *Cal. Civ. Code § 3439.08 as a Defense to Avoidance of a Fraudulent Transfer*

Pursuant to Cal. Civ. Code § 3439.08(a), "[a] transfer or an obligation is not voidable under paragraph (1) of subdivision (a) of Section 3439.04, against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." *See also AFI Holding*, 525 F.3d at 707 (quoting Cal. Civ. Code § 3439.08).

"The issue of good faith…is a defensive matter as to which the defendants asserting the existence of good faith have the burden of proof." *In re Cohen*, 199 B.R. 709, 718 (B.A.P. 9th Cir. 1996) (analyzing the good faith defense under Cal. Civ. Code § 3439.08(a)). "One lacks the good faith that is essential to the UFTA § 8(a) defense to avoidability if possessed of enough knowledge of the actual facts to induce a reasonable person to inquire further about the transaction." *Id*. (citing UFTA § 8); *see also Sec. & Exch. Comm'n v. Capital Cove Bancorp LLC*, 2015 WL 9701154, at *6 (C.D. Cal. Oct. 13, 2015) (applying *Cohen* to Cal. Civ. Code § 3439.08(a)).

### D. *Recovery of Restitution Payments*

In the context of 11 U.S.C. § 547(b), the Ninth Circuit Court of Appeals has held that criminal restitution payments to the government are not immune to being avoided. "The plain language of § 547(b) does not except criminal restitution payments." *In re Silverman*, 616 F.3d 1001, 1006 (9th Cir. 2010). There is no "clearly expressed legislative intent to the contrary." *Id*. Moreover, no "absurd" result "might flow from application of § 547(b) to criminal restitution payments." *Id*. "Therefore, we hold that criminal restitution payments (if they otherwise meet the statutory requirements of § 547(b)) are recoverable preferences in Chapter 7 bankruptcy." *Id*.

The Court of Appeals expounded on the policy behind this holding:

> [A]llowing an exception to § 547(b) for criminal restitution payments would
> frustrate the purposes of the preference statute. Instead of allowing more equitable
> distribution of a bankruptcy estate's assets, excepting non-dischargeable debts like
> criminal restitution payments from § 547(b) would allow a debtor to pay off this
> non-dischargeable debt during the preference period and leave other creditors
> with nothing…. Excepting criminal restitution payments from § 547(b) would,
> therefore, motivate debtors to pay off these non-dischargeable debts during the
> preference period, leaving all other debts to be extinguished in bankruptcy.

*Id*., at 1008.

## E.  *Sovereign Immunity*

Pursuant to 11 U.S.C. § 106(a)—

Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:

(1) Sections 105…544…548…550…of this title.

(2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.

(3) The court may issue against a governmental unit an order, process, or judgment under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages. Such order or judgment for costs or fees under this title or the Federal Rules of Bankruptcy Procedure against any governmental unit shall be consistent with the provisions and limitations of section 2412(d)(2)(A) of title 28.

(4) The enforcement of any such order, process, or judgment against any governmental unit shall be consistent with appropriate nonbankruptcy law applicable to such governmental unit and, in the case of a money judgment against the United States, shall be paid as if it is a judgment rendered by a district court of the United States.

## F.  *Controlling Effect of Pretrial Orders*

Pursuant to Fed. R. Civ. P 16(e)—

The court may hold a final pretrial conference to formulate a trial plan, including a plan to facilitate the admission of evidence. The conference must be held as close to the start of trial as is reasonable, and must be attended by at least one attorney who will conduct the trial for each party and by any unrepresented party. The court may modify the order issued after a final pretrial conference only to prevent manifest injustice.

"A pretrial order generally supersedes the pleadings, and the parties are bound by its contents." *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 950 (9th Cir. 1993); *see also Nw. Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 924 (9th Cir. 1988).

In *Northwest Acceptance*, appellants attempted to raise a defense of novation. *Id.*  The Court of Appeals rejected the defense because "[n]ovation was not raised in the pretrial order or prior to trial." *Id.*  As a result, the Court of Appeals held that the defense was waived. *Id.*; *see*

*also El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1077 (9th Cir. 2005) ("A defendant must enumerate its defenses in a pretrial order even if the plaintiff has the burden of proof.").

## IV.   ANALYSIS

### A.   *The Trustee Has Standing*

As of the petition date, Debtor had several creditors holding unsecured claims.  The Trustee may step into the shoes of these unsecured creditors to bring an avoidance action.  If the Trustee is able to demonstrate that avoidable fraudulent transfers exist, she may recover the transfer even if the amount surpasses the claims of Debtor's unsecured creditors. *Acequia*, 34 F.3d at 809.

### B.   *Defendant Waived the Statute of Limitations*

The parties did not include the statute of limitations defense arising from Cal. Civ. Code § 3439.09(a) in the Joint Pretrial Order.  In fact, the United States did not raise the defense until it filed its trial brief three weeks before trial.  The parties are bound by the contents of the Joint Pretrial Order.  Because the United States did not include the defense of statute of limitations in the pretrial order, and because the Trustee objected to the United States raising the issue for the first time at trial, the United States may not assert the defense at this time.[15]

### C.   *The Amended Complaint Relates Back to the Petition Date*

The parties dispute the relevant reach back date of Cal. Civ. Code § 3439.09(c).  Under 11 U.S.C. § 546 and *EPD*, *supra*, the reach back period is established on the petition date. *EPD*, 523 B.R. at 692.

Here, Debtor filed its voluntary chapter 7 petition on December 16, 2009.  Pursuant to Cal. Civ. Code § 3439.09, the Trustee may reach back seven years to December 16, 2002.  The Trustee may not avoid any transfers from Debtor prior to December 16, 2002.

### D.   *The United States May Not Assert Sovereign Immunity*

As explicitly set forth in the Bankruptcy Code, sovereign immunity is abrogated with respect to avoidance of fraudulent transfers. 11 U.S.C. § 106(a).  Assuming the Trustee is

---

[15] As noted above, the seven-year statute of repose under Cal. Civ. Code § 3439.09(c) may not be waived.

successful, the Court may enter judgment awarding monetary recovery to the Trustee.  Section

106(a)(3) only limits the Court's ability to award punitive damages against the United States.

### E. *Restitution Payments Are Subject to Avoidance*

Although there are no cases discussing whether a trustee may avoid a criminal restitution

payment as a fraudulent transfer, the Ninth Circuit Court of Appeals has held that such payments

may be recovered as preferential transfers under 11 U.S.C. § 547(b).  The reasoning of *Silverman*

applies here.  Allowing an exception to the Trustee's ability to recover fraudulent transfers

similarly hampers the Bankruptcy Code's aim to distribute an estate's assets equitably.  Absent

that ability, debtors, motivated to minimize other sentencing consequence, e.g., prison time,

would choose to make fraudulent transfers of money as payment of criminal restitution, leaving

the bankruptcy trustee powerless to undo the transaction for the benefit of creditors who did not,

or will not, receive such restitution.  Such a result is inequitable and contrary to the goals of the

Bankruptcy Code.  Thus, assuming the Trustee is able to meet her burden, the criminal restitution

payment to the United States would not be immune to recovery.

### F. *Defendant Is Not a Good Faith Transferee*

Assuming Debtor fraudulently transferred assets which funded Mr. Austin's restitution

payment, the United States would not be able to shield itself from avoidance by arguing that it

was a good faith transferee.

First, the United States qualifies as a "transferee" because the United States exercised

dominion over the restitution amount.  As in *Incomnet*, *supra*, "it is of no consequence that" the

United States "cannot invest funds" or use the funds in any way it pleases.  *Incomnet*, 463 F.3d at

1075.  The United States prosecuted Mr. Austin, pursued the case, demanded the restitution,

received the funds and distributed them to victims as it saw fit and pursuant to its own

investigation.  Similar to *Incomnet*, even if the United States was obligated to transfer the funds

to restitution victims, the United States exercised sufficient control over the restitution funds to

be deemed a transferee.

Next, the United States is not a good faith transferee.  The United States thoroughly

investigated Mr. Austin and all entities associated with Mr. Austin during the course of Mr.

Austin's criminal case.  The Investigation Report and all filings by the United States in the

criminal case evidence a detailed and complete understanding of Mr. Austin's finances and any

transfers involving Mr. Austin and the entities involved in movie production.  Thus, if Debtor's

assets funded Mr. Austin's restitution payment, the United States would be apprised of this

information.

## G. *Debtor Was Not Involved in a Ponzi Scheme*

The Trustee argues that Debtor was involved in a Ponzi scheme and that such

involvement is proof of actual intent to hinder, delay or defraud creditors.  The Trustee is correct

that the existence of a Ponzi scheme is sufficient to establish intent to defraud.  *Donell*, 533 F.3d

at 767.  However, the Trustee did not establish that Debtor was involved in a Ponzi scheme.

First, the evidence presented at trial indicated that Mr. Austin did not operate a Ponzi

scheme.  As explained by Ms. Lindsay, the fraud orchestrated by Mr. Austin involved inducing

people to invest money into the limited partnerships and then transferring the funds to, *inter alia*,

Mr. Austin for his personal use.  The money obtained by one limited partnership was not used to

pay investors in another limited partnership.  Further, investors were not falsely told that the

money they were receiving was due to profit.  Rather, the investors did not receive any money at

all.

The Trustee argues that Mr. Austin and the limited partnerships used investors' money to

pay settlements with other investors who had filed lawsuits.  However, the Trustee presented no

evidence to this effect.  Moreover, if true, using investors' money to pay off a settlement does

not fit the definition of a Ponzi scheme.  Paying an investor settlement money does not give

investors the false impression that a legitimate profitable business opportunity exists.

*Agricultural Research*, 916 F.2d at 531.

Notably, for the purposes of a fraudulent transfer action, "[t]he Ponzi scheme operator is

the debtor." *Donell*, 533 F.3d at 767.  Here, the Trustee did not show that Debtor was the

operator of a Ponzi scheme.  Thus, if the Trustee had shown any transfers from Debtor, the

Trustee could not rely on the existence of a Ponzi scheme to prove that any such transfers were

made with intent to hinder, delay or defraud creditors of Debtor.

### H. The Trustee Has Not Shown the United States' Receipt of Any Transfers from Debtor

#### 1. Funding for the Purchase of the Colony Property

The parties do not dispute that Mr. Austin used the proceeds from the sale of the Colony Property to make his restitution payment to the United States. To purchase the Colony Property in November 2004, the Austins used (1) a $4 million loan from Countrywide, a lending institution; (2) a $250,000 cash deposit by Mrs. Austin; (3) a $2.5 million deposit by Charles E. Ruben and Associates; and (4) a $2,418,530.98 deposit by Malibu Escrow Corp., which originated from the proceeds of the sale of the Malibu Road Property. The Trustee argued that Debtor may have funded the deposits used to acquire the Colony Property (excluding the loans from Countrywide and Washington Mutual Bank, F.A.).

#### a. The $250,000 Cash Deposit by Mrs. Austin

The Trustee contends that the $250,000 deposit by Mrs. Austin to purchase the Colony Property likely originated from Debtor, because Mrs. Austin failed to identify the source of the $250,000 and did not receive income from elsewhere at the time. However, the Trustee did not present a clear pathway of funds from Debtor to the $250,000 deposit and did not provide sufficient circumstantial evidence for the Court to draw this inference.

When the Austins purchased the Colony Property, Mr. Austin was actively engaged in the mail fraud for which he was convicted. The Investigation Report found that Mr. Austin participated in the fraudulent scheme related to *Funny Money* between May 2004 and December 2006, through which investors sent a total of $2.4 million to AFV, the limited liability company owned by Mr. Austin. In addition, Mr. Austin was convicted for failing to report to the IRS $874,500 of investor money he collected in 2003. The fraud for which Mr. Austin was convicted did not involve Debtor's assets. Rather, money would flow from the defrauded investors to the limited partnerships that were set up to fund films or to AFV, then to SAP and finally to the Austins' personal accounts. As a result, the evidence indicates that the Austins purchased the Colony Property using money obtained from these investors, not from Debtor.

In addition, as an officer, Mr. Austin received compensation and expense reimbursement from Debtor. At trial, Mr. Austin testified that Debtor would only transfer funds to SAP to pay

Mr. Austin his due compensation or to reimburse SAP for production costs. The corporate tax returns filed by Debtor verified that Debtor paid salaries and wages to its employees. For the year 2004, Mr. Robbins testified that Debtor paid Mr. Austin $275,000 as salary. Salary payments are not fraudulent unless they are shown to be excessive. *See, e.g,. In re Felt Mfg. Co., Inc.*, 371 B.R. 589, 651 (Bankr. D. N.H. 2007) (finding that the plaintiff failed to establish that debtor's compensation was excessive or not comparable to work performed). The Trustee did not allege that Mr. Austin's salary from Debtor was excessive.

Finally, both parties acknowledged that Mrs. Austin collected rents from the Valleyheart Property between April 2003 and February 2004. Moreover, Mrs. Austin generated a significant profit from the sale of the Valleyheart Property in February 2004. Thus, the Trustee is incorrect that, prior to the purchase of the Colony Property in November 2004, Mrs. Austin did not have a source of income.

Consequently, the Trustee did not meet her burden of proving that the $250,000 deposit for the Colony Property originated from Debtor and that any transfers to Mr. Austin were made with the intent to hinder, delay or defraud creditors of Debtor.

### b. The $2.5 Million Deposit by Charles E. Ruben and Associates

The Trustee also asserts that Debtor funded the $2.5 million deposit by Charles E. Ruben and Associates. The parties do not dispute that the $2.5 million deposit originated from the Vechery Trust's $2.5 million in loans to Mr. Austin, *i.e.*, the Colony Property Acquisition Loans. Mr. Austin executed two notes totaling $2.5 million in favor of the Vechery Trust, and the Vechery Trust then wired $2.5 million to Mr. Ruben's client trust account. The Trustee makes three arguments related to the Colony Property Acquisition Loans.

First, the Vechery Trust loaned money to Supercross the Movie, LP and Downtown the Movie, LP. These limited partnerships and Debtor repaid those loans. According to the Trustee, after Debtor contributed money to repay these debts, the Vechery Trust used these monies to fund the Colony Property Acquisition Loans. Second, the Trustee contends that Debtor made interest payments on the Colony Property Acquisition Loans. Third, the Trustee contends that Mr. Austin used Debtor's assets to pay off the Colony Property Acquisition Loans.

The evidence does not support the Trustee's contentions. To establish Debtor's repayment of loans from the Vechery Trust to the limited partnerships, the Trustee relies on a $500,000 check, dated October 8, 2004, made in favor of the Vechery Trust. The check, which reflects a Comerica Bank account, does not identify the payor. Because Mr. Austin testified that Debtor at one time maintained a Comerica Bank account, the Trustee asks the Court to infer that the check was written by Debtor. However, this information is insufficient to presume the $500,000 came from Debtor.[16]

Even if Debtor made this transfer to the Vechery Trust, the Trustee did not show that the transfer was made with intent to hinder, delay or defraud any creditor of Debtor. Applying the badges of fraud found in Cal. Civ. Code § 3439.04(b), such a transfer from Debtor to the Vechery Trust: (1) was not to an insider;[17] (2) did not result in Debtor retaining possession or control of the funds after the transfer; (3) was not concealed; (4) did not involve Debtor absconding; and (5) did not involve Debtor removing or concealing assets. During the time period of this transfer, Debtor was a named defendant in only one lawsuit, which was initiated in May 2004.[18] *Plaintiff's Exhibits 11-16*. Further, the Trustee did not show that Debtor was insolvent in 2004. As explained by Mr. Levine, the corporate tax returns for the pertinent time period did not indicate that Debtor was insolvent, only that Debtor had a tax loss.

In addition, the Trustee did not demonstrate that Debtor did not receive reasonably equivalent value for such a transfer. Debtor received a fee from limited partnerships for distributing their completed movies. Because Debtor would not receive such fees if there were no films to distribute, Debtor had an interest in securing the Vechery Trust loans with its film library and helping to repay the loans. Finally, the Trustee did not show that Debtor "transferred the essential assets of the business" under Cal. Civ. Code § 3439.04(b)(11).

---

[16] In fact, the checks issued by Debtor that were presented at trial came from Citibank or Bank of America accounts.
[17] Mr. Vechery testified that he personally invested in Debtor and became a shareholder. However, the Trustee did not present any evidence that the Vechery Trust qualified as an insider.
[18] The Trustee also included evidence of a lawsuit against Mr. Austin and several defendants initiated by J. Todd Harris, Inc. *Plaintiff's Exhibits 17-19*. It appears that though "TAG Studios, LLC" was a named defendant in that lawsuit, Debtor was not. *Id*.

Regarding Debtor's provision of interest payments, the Trustee noted an October 7, 2004 check in the amount of $8,333 to the Vechery Trust. The Trustee argued that Debtor made this payment as interest on the Colony Property Acquisition Loans. However, the Vechery Trust made these loans over a month after Debtor issued this check. Further, it appears that the $8,333 was intended to pay interest on either the Supercross Agreement or the Downtown Agreement. Thus, the Trustee did not demonstrate that Debtor made interest payments on the Colony Property Acquisition Loans.

### c.    The $2,418,530.98 Deposit by Malibu Escrow Corp.

The $2,418,530.98 deposit by Malibu Escrow Corp. for the Colony Property arose from the sale proceeds of the Malibu Road Property. In April 2003, Mrs. Austin purchased the Malibu Road Property for $2.25 million. The Malibu Road Property was purchased using: (1) a January 8, 2003 $100,000 deposit from Mr. Austin; (2) a January 13, 2003 $20,000 deposit from Mrs. Austin; (3) another $475,000 deposit from Mrs. Austin; and (4) the WaMu Loan, secured by a lien on the Malibu Road Property. As noted above, the Trustee has the burden of proving that the Debtor generated the deposits by Mr. and Mrs. Austin.

Within the statutorily allowed time frame (*i.e.*, after December 16, 2002),[19] the Trustee has identified transfers to Mr. Austin of $364,012 in 2002 and $118,066 in 2003, *i.e.*, the Officer Account Loans.[20] As concerns the identified Officer Account Loans, the evidence is unclear about which portion of the $364,012 transferred to Mr. Austin in 2002 occurred *after* the December 16, 2002 cutoff date. Moreover, the Trustee did not demonstrate that these funds were used to purchase the Malibu Road Property or to repay the debt encumbering the Malibu Road Property. In fact, in 2003 and 2004, Mr. Austin inappropriately pocketed a considerable amount of money from movie investors. To acquire or pay debt encumbering the Malibu Road Property, the Austins apparently used the substantial funds fraudulently received from these investors.

---

[19] The remainder of the $3.1 million "loan" owed by Mr. Austin was accrued prior to 2002, which is outside of the time limit allowed by the statute of repose set forth in Cal. Civ. Code § 3439.09.

[20] The Trustee also noted transfers from Debtor to SAP on and after September 23, 2005. However, these transfers took place long after the Malibu Road Property was sold.

### i.  The $20,000 and $100,000 January Deposits from the Austins

The Trustee did not sufficiently demonstrate that the $120,000 in deposits from the Austins for the Malibu Road Property came from Debtor.  Although the deposits were made in January 2003, and Mr. Austin was held responsible for the Officer Account Loans, the Trustee did not show that that Mr. Austin actually received these funds, instead of agreeing to be held responsible for them because of insufficient production receipts.  The record also does not evidence that Mr. Austin received any other funds from Debtor, except salary, prior to the purchase of the Malibu Road Property in April 2003.

### ii.  The $475,000 Deposit from Mrs. Austin

The Trustee also argues that the $475,000 deposit from Mrs. Austin for the Malibu Road Property came from Debtor.  The Trustee did not demonstrate that Debtor funded this deposit.[21] According to the Investigation Report, Mr. Austin was improperly receiving significant funds from movie investors in 2003.  It appears that Mr. Austin used these funds in April 2003 to purchase the Malibu Road Property, and not funds generated by Debtor.

### iii.  Debt Encumbering the Malibu Road Property

The Trustee did not show that Debtor funded the repayment of debt encumbering the Malibu Road Property.  To support her case, the Trustee had to show that Debtor's funds, other than Mr. Austin's salary payments and properly documented production reimbursements, were used to repay the mortgage on the Malibu Road Property between April 30, 2003, the date of purchase, and November 17, 2004.  The evidence does not show any such transfers from Debtor during the applicable time period.

### 2.  *Other Miscellaneous Transfers*

The Trustee also pointed to the following as suspect transactions: (1) the 1999-2003 "withdrawals by officers" from Debtor; (2) the deposit used to purchase the PCH Property; (3)

---

[21] Mr. Austin testified that Mrs. Austin obtained a bridge loan to cover the $475,000.  According to Mr. Austin, the bridge loan was repaid upon the sale of the Valleyheart Property.

the Satellite Financing; and (4) certain transfers from Debtor to SAP.  Each of these transactions is discussed below.[22]

### a.   The Officer Account Loans

As previously noted, the Trustee may not avoid transfers taking place from 1999 through 2001; recovery of such transfers is barred by Cal. Civ. Code § 3439.09(c).  Consequently, the relevant Officer Account Loans would be the $364,012 transfer in 2002 and the $118,066 transfer in 2003.

With respect to the $364,012 transfer, the Trustee may only avoid transfers that occurred on or after December 16, 2002.  It is unclear what, if any, portion of the $364,012 increase in 2002 falls within the appropriate timeline.  Furthermore, it has not been established that Mr. Austin actually used these funds for anything other than movie production expenses.  Mr. Austin explained that expenses would be tracked by handwriting each cost on a "petty cash envelope." According to Mr. Austin, the producers did not track many of the expenses incurred during film production and/or lost receipts.    Mr. Gonzalez explained that many of the transfers were used to operate Debtor.  Because the auditors could not match each transfer to an operating cost, they decided to treat the unaccounted for expenses as loans to Mr. Austin.

Even if funds from Debtor were used to acquire the Malibu Road Property (and thus, eventually to acquire the Colony Property), the Trustee did not prove, by a preponderance of the evidence, that the transfers were made with intent to hinder, delay or defraud creditors of Debtor. Among other things,  Debtor was a named defendant in only two lawsuits at the time, and the Trustee did not establish that Debtor was insolvent prior to the purchase of the Malibu Road Property.

Further, as evidenced by the Form 8-K filing, Mr. Austin subsequently provided reasonably equivalent value in exchange for the Officer Account Loans; namely, Mr. Austin surrendered 777,504 shares of stock valued at $4.00 per share.  According to Mr. Robbins, this surrender was fair to Debtor and in line with Generally Accepted Accounting Principles.

---

[22] The Trustee asserts that the $992,324.89 buyer's refund check issued to Mrs. Austin is suspect.  However, the Trustee never linked this refund to the restitution payment.

### b.   The PCH Property Deposit

The Trustee highlighted the cash deposits used to purchase the PCH Property as another suspect transfer.  In April 2004, shortly after her profitable sale of the Valleyheart Property, Mrs. Austin purchased the PCH Property.  Between April 2003 and February 2004, Mrs. Austin was collecting rent from the Valleyheart Property.  In addition, at this time, Mr. Austin was receiving large sums of money from movie investors. The Trustee did not establish that the money used to acquire the PCH Property originated from Debtor instead of such other sources.

Moreover, the proceeds from the sale of the PCH Property were not used to purchase the Colony Property.  Mrs. Austin sold the PCH Property in January 2006, long after the Austins purchased the Colony Property.  Of the sale proceeds from the PCH Property, the Vechery Trust received $1.92 million to repay (in part) the $2 million loan used to purchase the Colony Property.  *See Plaintiff's Exhibit 547* ("Agreement to Provide Secured Promissory Note Secured by Secured Deed of Trust").  There is no evidence tying the sale proceeds from the PCH Property to Mr. Austin's restitution payment.

### c.   The Satellite Financing Proceeds

The Trustee pointed to several transfers out of Debtor's account after receipt of the Satellite financing.  Debtor received financing from Satellite *after* Mrs. Austin purchased the Colony Property; these funds could not have been used to acquire the Colony Property.  Moreover, the Trustee did not show that any of these transfers found their way to SAP or Mr. Austin, or to the Austins' real property purchases.[23]

According to Mr. Skiptunis, aside from the approximately $3-4 million that was used as working capital, Debtor transferred $2 million from the Satellite financing to cover production costs for the movie *Supercross*.  The Trustee did not show that the monies transferred to Supercross the Movie, LP were used for any purpose other than production costs, such as to repay loans secured by the Colony Property.

---

[23] The Trustee also pointed to a September 14, 2005 transfer from Goldstein & DiGioia, LLP to Debtor in the amount of $200,000, which was subsequently wired out of Debtor's account.  The Trustee did not link this transfer to the restitution payment received by the United States.

#### d. The Transfers from Debtor to SAP

The record reflects the following transfers by Debtor to Mr. Austin, via SAP: a total of $100,000 in 2005, a total of $85,000 in 2006, and a total of $89,763.31 in 2007.  These transfers occurred *after* the Austins acquired the Colony Property.  In addition, the Trustee did not show that these transfers were used to repay the Colony Property Acquisition Loans.[24]

Further, the Trustee has not met her burden of proving that these transfers were made with intent to hinder, delay or defraud any creditor of Debtor.  For 2004, Mr. Austin's allotted salary was $500,000, including bonuses of around $140,000.  Mr. Robbins testified that Mr. Austin would not take a biweekly or monthly salary; instead he would withdraw funds from Debtor and offset the amount against his salary.  Because Mr. Austin received $275,000 of his salary in 2004, Debtor owed Mr. Austin $364,000 in salary for that year.  The Trustee did not show that the transfers from Debtor to SAP were in excess of Mr. Austin's salary, or that Mr. Austin's salary was excessive.

#### 3. The Trustee Did Not Meet Her Burden of Proof

Based on these transactions, the Trustee asks the Court to infer that Debtor made fraudulent transfers to fund the restitution payment.  Like in *Kremen*, merely highlighting a series of allegedly irregular transfers is not sufficient to demonstrate that Debtor's funds were used to pay Mr. Austin's restitution.

In accordance with *International Administrative*, 408 F.3d at 708, the Trustee need not provide a "dollar-for-dollar" tracing.  However, the court in *International Administrative* found that the money transferred to the defendant "originated solely" with the debtor.  *International Administrative*, 408 F.3d at 708.  Here, the Trustee has not made a similar showing.

Although the Trustee spent considerable effort detailing the transfers above, the Trustee did not demonstrate that any of the transfers flowed from Debtor to the United States.  Even if any of Debtor's assets were transferred to or for the benefit of the Austins, the Trustee did not

---

[24] The $2 million loan from the Vechery Trust was secured by the PCH Property, not the Colony Property; repayment of this loan did not impact the Austins' equity in the Colony Property.

meet her burden of proving that any transfers were made with intent to hinder, delay or defraud creditors of Debtor.

## V.    RECOMMENDATION

In accordance with 28 U.S.C. § 157(a), the District Court has issued a standing order generally referring all cases under title 11 and all proceedings arising under, arising in or related to cases under title 11 to the bankruptcy judges for the Central District of California.  The District Court is authorized by 28 U.S.C. § 157(d) to withdraw, in whole or in part, the reference as to any case or controversy "for cause shown." *See* Fed. R. Bankr. P. 5011(a), 9033.  The Court respectfully submits that the foregoing facts, coupled with the constitutional mandate that this Court does not have authority to enter final judgment in this proceeding, constitute sufficient cause within the meaning of 28 U.S.C. § 157(d), for the District Court to withdraw the reference to the extent set forth below.  Accordingly, the Court recommends:

1. That the District Court *sua sponte* withdraw the reference pursuant to 28 U.S.C. § 157(d) for the purpose of entering final judgment in this proceeding; and

2. That the District Court enter judgment in favor of the United States.

<div align="center">###</div>

Date: March 29, 2016

Victoria S. Kaufman
United States Bankruptcy Judge

**APPENDIX A – REAL ESTATE TRANSACTIONS INVOLVING THE AUSTINS**

| DATE | PROPERTY | TRANSFER | TOTAL PURCHASE OR SALE PRICE |
|---|---|---|---|
| August 17, 2001 | 12055 Valleyheart Drive, Studio City, CA 91604 ("Valleyheart Property") | Mrs. Austin purchases this property. | $550,000.00 <br><br> SOURCE: Unclear/Not Established |
| November 2, 2001 | 5452 Matilija Avenue, Van Nuys, CA 91404 | Mrs. Austin sells this property. | $500,000.00 |
| April 30, 2003 | 24748 Malibu Road, Malibu, California 90265 ("Malibu Road Property") | Mrs. Austin purchases this property. | $2,250,000.00 <br><br> SOURCE: <br><br> 1. $100,000 from Mr. Austin <br> 2. $20,000 from Mrs. Austin <br> 3. $475,000 from Mrs. Austin <br> 4. $1,687,600 loan from Washington Mutual Bank, F.A. |
| February 27, 2004 | Valleyheart Property | Mrs. Austin sells this property. | Approx. $1,500,000.00 |
| April 8, 2004 | 20540 Pacific Coast Hwy, Malibu, CA ("PCH Property") | Mrs. Austin, as trustee of the Kasten 2004 Trust, purchases this property. | $1,660,000.00 <br><br> SOURCE: <br><br> 1. $49,800 from Mrs. Austin <br> 2. Otherwise, unclear/not established |
| November 17, 2004 | Malibu Road Property | Mrs. Austin sells this property. | $4,300,000.00 |
| November 17, | 78 Malibu Colony Road, | Mrs. Austin purchases this | $9,168,530.98 |

| 2004 | Malibu, CA 90265 ("Colony Property") | property. | SOURCE:<br><br>1. $4 million loan from Countrywide<br>2. $250,000 from Mrs. Austin<br>3. $2,418,530.98 – proceeds from sale of Malibu Road Property<br>4. $2.5 million in loans from the Vechery Trust ($2 million loan secured by the PCH Property and $500,000 loan secured by the Colony Property) |
|---|---|---|---|
| January 10, 2006 | PCH Property | Kasten 2004 Trust deeds property to Mr. Austin. | |
| January 12, 2006 | PCH Property | Americorp Funding loans $1.92 million to Mr. Austin, secured by the PCH Property. | |
| January 24, 2006 | PCH Property | Mr. Austin sells this property. | $2,425,000.00 |
| January 25, 2006 | PCH Property | Mr. Austin pays $1.92 million of the $2 million loan from the Vechery Trust secured by the PCH Property. | |
| May 31, 2007 | Colony Property | Mrs. Austin sells this property. | $13,800,000.00 |